Norm COLEMAN, et al., Petitioners,

v.

Mark RITCHIE, Minnesota Secretary of State, The Minnesota State Canvassing Board, Isanti County Canvassing Board, et al., Respondents,

Al Franken for Senate and Al Franken, Intervenor–Respondents.

No. A08–2169.

Supreme Court of Minnesota.

March 6, 2009.

Roger J. Magnuson, James K. Langdon, John Rock, Dorsey & Whitney LLP, Minneapolis, Minnesota; and Tony P. Trimble, Matthew W. Haapoja, Trimble & Associates, Ltd., Minnetonka, Minnesota, for petitioners.

Lori Swanson, Attorney General, Christie B. Eller, Deputy Attorney General, Kenneth E. Raschke, Jr., Assistant Attorney General, St. Paul, Minnesota, for respondents Mark Ritchie, Minnesota Secretary of State, and the Minnesota State Canvassing Board.

Michael O. Freeman, Hennepin County Attorney, Patrick C. Diamond, Assistant County Attorney, Minneapolis, Minnesota, for respondent Hennepin County Canvassing Board.

William Z. Pentelovitch, Mary Vasaly, Maslon Edelman Borman & Brand, LLP, Minneapolis, Minnesota; David L. Lillehaug, Steven Z. Kaplan, Fredrikson & Byron, P.A., Minneapolis, Minnesota; and Marc E. Elias, Kevin J. Hamilton, Perkins Coie LLP, Washington, D.C., for intervenor-respondents.

## OPINION

MEYER, Justice.

Petitioners Norm Coleman, Cullen Sheehan, and Cara Beth Lindell filed a petition and an amended petition pursuant to Minn.Stat. § 204B.44 (2008) concerning the November 4, 2008, election for United States Senator from the State of Minnesota. Petitioners asked the court to order, among other things, that no rejected absentee ballots be counted in the administrative recount then underway and that all issues related to such ballots be raised, if at all, in an election contest under Minn. Stat. ch. 209 (2008). After expedited briefing, the court heard oral argument on December 17, 2008. So as not to impede the orderly administration of the election, the court issued an order on December 18, 2008, granting in part and denying in part the petition, with this opinion to follow.

At issue here are absentee ballot return envelopes that were rejected by local election officials on and before election day. The process of voting by absentee ballot is governed by Minn.Stat. ch. 203B (2008). A voter first makes written application for an absentee ballot. Minn.Stat. § 203B.04 (2008). An absentee ballot is provided to the voter, along with a ballot envelope and a return envelope. Minn.Stat. § 203B.06–.07 (2008). The voter marks the ballot with his votes, places the ballot in the ballot envelope, and places the sealed ballot envelope (and a voter registration application, where needed) in the return envelope. *See* Minn.Stat. § 203B.08 (2008). The voter fills in his name and address on the return envelope, completes a certificate of eligibility to vote by absentee ballot printed on the return envelope, and signs the certificate before a witness who also signs the return envelope. *See* Minn.Stat. § 203B.07, subd. 3. The return envelope (containing the ballot envelope in which the completed ballot has been placed) is then returned to the county auditor or municipal clerk. Minn.Stat. § 203B.08, subd. 1.

Under Minn.Stat. § 203B.12, subd. 2 (2008), two or more election judges examine each return envelope and mark it

either "accepted" or "rejected."[1] The election judges are to mark the return envelope "accepted" if they are satisfied that all of the following four conditions are met:

(1) the voter's name and address on the return envelope are the same as the information provided on the absentee ballot application;

(2) the voter's signature on the return envelope is the genuine signature of the individual who made the application for an absentee ballot, and the certificate of eligibility to vote by absentee ballot has been completed as prescribed in the directions for casting an absentee ballot;

(3) the voter is registered and eligible to vote in the precinct or has included a properly completed voter registration application in the return envelope; and

(4) the voter has not already voted in that election, either in person or by absentee ballot.

*Id.* If the absentee ballot return envelope is "accepted," it is opened and the ballot envelope inside is placed in a separate ballot container. Minn.Stat. § 203B.12, subd. 4 (2008). The absentee ballot container is opened on election night, the ballot envelopes inside are opened, and the enclosed ballots are removed and deposited in the ballot box to be counted. *Id.*

If, on the other hand, any of the four requirements under section 203B.12 have not been met, the election judges are to mark the return envelope "rejected."[2] Section 203B.12, subdivision 2, states:

"There is no other reason for rejecting an absentee ballot." Rejected absentee ballot return envelopes are returned unopened to the county auditor, and the ballots they contain are not counted on election night. *Id.*

On November 18, 2008, the Minnesota State Canvassing Board (Board) met to certify the results of the election held on November 4, 2008. Because the difference in votes cast for U.S. Senate candidates Norm Coleman and Al Franken was less than one-half of one percent, the Board ordered an automatic manual recount as required by Minn.Stat. § 204C.35, subd. 1(b) (2008).

According to the minutes of the November 18 meeting of the State Canvassing Board, a representative of Al Franken and the Al Franken for Senate campaign urged the Board to review all rejected absentee ballot return envelopes and include in its recount the votes of any absentee ballots that were improperly rejected. This request was opposed by representatives of Norm Coleman and the Norm Coleman for Senate campaign. In advance of the November 18 meeting, the Secretary of State had received an opinion of the Minnesota Attorney General's Office that absentee ballots that were rejected by election judges under Minn.Stat. § 203B.12, subd. 2, were not "cast" in the election and therefore were not within the scope of an administrative recount under Minn.Stat. § 204C.35, subd. 3 (2008). At its November 26, 2008, meeting, the Board unani-

---

1. If the county or municipality has established an absentee ballot board, Minn.Stat. § 203B.13, subd. 2 (2008), allows the absentee ballot board to begin examining return envelopes and marking them "accepted" or "rejected" during the 30 days before the election. If there is no absentee ballot board, the absentee ballots are delivered to local election officials on election day. Minn.Stat. § 203B.08, subd. 3.

2. A similar process is to be followed, under the federal Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. §§ 1973ff–1973ff–6 (2000, Supp. III 2003 & Supp. IV 2004), with respect to absentee ballots cast by voters who are overseas or serving in the military. *See* Minn.Stat. §§ 203B.16, 203B.24, subd. 1 (2008).

mously rejected the Franken campaign's request as outside the scope of the Board's statutory authority under Minn.Stat. § 204C.33, subd. 3 (2008). However, the Board requested an opinion of the Attorney General as to whether and by what means absentee ballots that were not rejected for one of the four statutory reasons could be tabulated.

On or around December 2, 2008, the Secretary of State's Office asked local election officials to review all previously rejected absentee ballot return envelopes and determine the number of envelopes that were rejected for each of the four reasons provided in Minn.Stat. § 203B.12, subd. 2. The Secretary of State's Office asked local election officials to determine as well the number of absentee ballot return envelopes rejected for some reason other than one of the reasons provided in Minn.Stat. § 203B.12, subd. 2, or because local election officials were mistaken in concluding that the ballot envelope failed to satisfy one or more of the conditions in section 203B.12, subdivision 2. The Secretary of State's Office provided more detailed instructions for the sorting process on December 4, 2008.

By letter to the members of the State Canvassing Board dated December 10, 2008, the Minnesota Attorney General's Office identified and described four statutory mechanisms for correcting errors in the election process: correction of errors by county election officials as part of the canvassing process under Minn.Stat. § 204C.38 (2008) where the candidates agreed; correction of errors under Minn. Stat. § 204C.39 (2008) where the candidates did not agree; a petition filed under Minn.Stat. § 204B.44; and an election contest under Minn.Stat. ch. 209. The Attorney General's Office opined that local canvassing officials could amend their election returns under either section 204C.38 or 204C.39 before the results of the election were finalized. Finally, citing our opinion in *In re Andersen*, 264 Minn. 257, 119 N.W.2d 1 (1962), the Attorney General's Office opined that this court would likely uphold a determination by the State Canvassing Board to accept amended reports from county canvassing boards that included absentee ballots that were initially improperly rejected by local election officials due to administrative errors.

At its December 12, 2008, meeting, the State Canvassing Board was advised by a representative of the Secretary of State that in the 49 counties and municipalities that had thus far completed their voluntary sorting and reported the results to the Secretary of State, there were 4,823 rejected absentee ballot return envelopes, of which 638 had been determined by local election officials to have been improperly rejected. However, some counties had declined to participate in the voluntary sorting process. The Board unanimously recommended, but declined to order, that all county canvassing boards review rejected absentee ballot return envelopes for the purpose of identifying obvious errors in the rejection of those ballots, correcting those errors, and reporting new vote totals to the State Canvassing Board.

The petition and an amended petition in this case were filed on December 15, 2008. The petition alleged that the State Canvassing Board failed to provide uniform guidance to the counties on how to determine whether or not an absentee ballot return envelope was improperly rejected. The petition further alleged that the guidance given to counties by the Secretary of State's Office for sorting the previously rejected absentee ballot envelopes was incomplete and incorrect, resulting in the various counties applying different standards. The petition asserted that previ-

ously rejected absentee ballots should be addressed, if at all, in an election contest under Minn.Stat. ch. 209, and not as part of the recount process.

Al Franken and the Al Franken for Senate campaign asserted, in opposition to the petition, that county canvassing boards have the authority under Minn.Stat. § 204C.39 and our decision in *Andersen* to review uncounted absentee ballots and correct errors in the exclusion of those ballots.

We issued an order on December 18, 2008, that granted in part and denied in part the petition. We agreed with petitioners that improper rejection of an absentee ballot envelope is not within the scope of errors subject to correction by county canvassing boards during an administrative recount proceeding under either Minn.Stat. § 204C.38 or § 204C.39. Separately, we observed that, where local election officials and the candidates agreed that an absentee ballot return envelope was improperly rejected, correction of that error should not have to await an election contest. We therefore ordered that any absentee ballot return envelope that local election officials and the candidates agreed was rejected in error should be opened by local election officials and its ballot counted, subject to challenge by either candidate as to voter intent, in accordance with the procedures used with respect to all ballots reviewed in the recount.

The question before us on December 18, 2008, was whether improperly rejected absentee ballots are within the scope of errors subject to correction by county canvassing boards that may be filed in an amended report under Minn.Stat. § 204C.38 or § 204C.39. Put differently, must the resolution of whether rejected

absentee ballots were validly cast for the office await an election contest under Minn.Stat. ch. 209?

## I.

■ We begin by briefly reviewing the statutory provisions for processing of ballots in an election, as prescribed in Minn. Stat. ch. 204C (2008).

Under Minn.Stat. § 204C.20, subd. 1 (2008), local election officials first determine the number of ballots to be counted on election night by adding the number of return envelopes from accepted absentee ballots to the number of signed voters' certificates, or to the number of names entered in the election register. Procedures are prescribed for situations in which there are more ballots in the ballot box than the number of ballots to be counted. *Id.*, subd. 2. Once the votes contained on the ballots have been counted, the election judges prepare a summary statement that reports: (1) the number of votes each candidate received; (2) the number of "undervotes" and "overvotes" for each office;[3] (3) the numbers of totally blank, totally defective, spoiled, and unused ballots; (4) the number of individuals who voted at the election in the precinct; and (5) the number of voters who registered on election day in the precinct. Minn.Stat. § 204C.24, subd. 1 (2008). These are the precinct "returns" transmitted to the county canvassing boards through the county auditors.

The counted ballots, along with any defective and blank ballots, are sealed in envelopes and delivered, together with the summary statement of returns, to the county auditor. Minn.Stat. §§ 204C.25, .27 (2008). Minnesota Statutes § 204C.28,

---

**3.** An "undervote" occurs when a voter fails to mark his ballot for any candidate for a particular office. An "overvote" occurs when a voter marks his ballot for more than one candidate for a particular office. *See* Minn. Stat. § 204C.24, subd. 1(a) (2008).

subd. 1 (2008), bars the county auditor from opening the envelopes containing the ballots themselves.

Within seven days of the state general election, the respective county canvassing boards meet to canvass the general election returns delivered by local election officials to the respective county auditors. Minn.Stat. § 204C.33, subd. 1 (2008). At that stage of the process, Minnesota law allows county canvassing boards to open the envelopes containing the ballots themselves only to retrieve returns that were inadvertently sealed in the envelopes with the ballots. Minn.Stat. § 204C.28, subd. 1. Upon completion of the canvass, the county canvassing board reports to the county auditor: (1) the number of individuals voting in the election in the county; (2) the number of individuals registered to vote in each precinct; and (3) the names of the candidates for each office and the number of votes received by each candidate in the county. Minn.Stat. § 204C.33, subd. 1. Certified copies of the county canvassing board reports are then transmitted by the county auditors to the Secretary of State. *Id.* These summary statements are transmitted in envelopes that the legislature requires to be labeled: "Election Returns." Minn.Stat. § 204C.37 (2008).

There are two statutory mechanisms by which county canvassing boards may correct errors made by local election officials. One mechanism applies where the candidates agree an error has occurred, and the other applies where the candidates do not agree.

Minnesota Statutes § 204C.38 provides that if the candidates for an office unanimously agree in writing that election judges in a particular precinct or ·a county canvassing board have made "an obvious error in the counting or recording of the votes for that office," the county canvassing board "shall" correct the error "as specified in the [candidates'] agreement." Minn.Stat. § 204C.38, subds. 1 and 2. Thus, by the terms of the statute, an agreement of the candidates that an error occurred in the counting or recording of votes is binding on the county canvassing board.

If the candidates do not agree, Minn. Stat. § 204C.39, subd. 1, allows a county canvassing board to determine by majority vote that election judges made "an obvious error in counting or recording the votes for an office."[4] But the statute does not authorize the county canvassing board to correct such errors unilaterally. Instead, section 204C.39, subdivision 1, requires the county canvassing board to notify the can-

---

4. Section 204C.39, subdivision 1, reads as follows:

A county canvassing board may determine by majority vote that the election judges have made an obvious error in counting or recording the votes for an office. The county canvassing board shall then promptly notify all candidates for that office of the determination, including a description of the error. A candidate who receives notification pursuant to this subdivision or any candidate who believes that the election judges in a precinct have made an obvious error in the counting or recording of the votes for an office may apply without unreasonable delay to the district court of the county containing the precinct in which the alleged error was made for an order determining whether or not an obvious error has been made. The applicant shall describe the alleged error in the application and may submit additional evidence as directed by the court. The applicant shall notify the county canvassing board and all candidates for the affected office in the manner directed by the court. If the court finds that the election judges made an obvious error it shall issue an order specifying the error and directing the county canvassing board to inspect the ballots and returns of the precinct in order to correct the error and to proceed further in accordance with this section or otherwise as the court may direct.

didates of its determination that an error has been made. Any candidate who receives such a notice, or who otherwise believes that election judges in a particular precinct have made an obvious error in the counting or recording of the votes for an office, may apply to the district court of that county for an order determining whether an obvious error has been made. *Id.* If the court finds that an obvious error has been made, it directs the county canvassing board to inspect the ballots of the precinct in order to correct the error. *Id.* After inspecting the ballots, the county canvassing board files an addendum to its initial report reflecting the total number of votes received by each candidate for the office. *Id.*, subd. 3.

On the second Tuesday following the state general election, the State Canvassing Board meets to canvass the certified copies of the returns of the county canvassing boards. Minn.Stat. § 204C.33, subd. 3. Based on those reports, the Board prepares a report stating the number of individuals who voted in the state (county-by-county) and the number of votes received by each of the candidates (county-by-county). *Id.*[5]

The Minnesota legislature has established two statutory procedures for resolving disputes concerning the outcome of elections: a manual administrative recount under Minn.Stat. § 204C.35 and an election contest under Minn.Stat. ch. 209.

■ A manual administrative recount is intended to ensure that the votes cast in the election were accurately counted. When the margin of victory in an election is less than one-half of one percent, as it was in this election, a manual recount is automatic. Minn.Stat. § 204C.35, subd.

1(b) (2008). It is this automatic manual recount that was ordered by the State Canvassing Board at its November 18, 2008, meeting.

Section 204C.35, subdivision 3, limits the scope of an administrative recount "to the determination of the number of votes validly cast for the office to be recounted. Only the ballots cast in the election and the summary statements certified by the election judges may be considered in the recount process." Thus, the scope of the errors that may be corrected as a result of the recount is limited to errors in "the determination of the number of votes validly cast for the office." At the same time, the information available to those conducting the recount is also limited: only the ballots actually cast in the election and the summary statements certified by the election judges on election night are to be considered.

Minnesota Statutes § 204C.361(a) (2008) requires the Secretary of State to adopt uniform recount procedures, and requires that all recounts be conducted in accordance with those rules. Under Minn. R. 8235.0700 (2007), the materials available during the administrative recount are the summary statements prepared by election judges on election night and the sealed envelopes of voted ballots, although other materials are to be available upon request. During the recount, the sealed envelopes of ballots are opened and the ballots inside are recounted in accordance with Minn. Stat. § 204C.22 (2008) (providing standards for determining voter intent). Minn. R. 8235.0800 (2007).

The other statutory procedure established by the legislature for resolving elec-

---

5. The mechanism available under Minn.Stat. § 204C.38 for correction of "obvious error[s] in the counting and recording of the vote[s]" to which the candidates agree applies to the State Canvassing Board as well. Minn.Stat. § 204C.38, subd. 3. The State Canvassing Board, like the county boards, is bound by the agreement of the candidates. *Id.*

tion disputes is an election contest under Minn.Stat. ch. 209. In contrast to the limited scope of an administrative recount, an election contest under chapter 209 "may be brought over an irregularity in the conduct of an election or canvass of votes, over the question of who received the largest number of votes legally cast, ... or on the grounds of deliberate, serious, and material violations of the Minnesota Election Law." Minn.Stat. § 209.02, subd. 1 (2008).

Notice of an election contest must be served and filed within seven days after the completion of the canvass. Minn.Stat. § 209.021, subd. 1 (2008). In the case of an election for statewide office, the notice of election contest must be filed in Ramsey County District Court. *Id.*, subd. 2. The case is heard by a panel of three judges, Minn.Stat. § 209.045 (2008), and is conducted, as far as is practicable, as a civil trial, Minn.Stat. § 209.065 (2008). When the election contest concerns a congressional office, the only question to be decided is which candidate received the highest number of votes legally cast at the election. Minn.Stat. § 209.12 (2008). Nevertheless, evidence on any other issues specified in the notice of election contest is to be preserved and forwarded to the presiding officer of the Senate or House of Representatives of the United States, as the case may be. *Id.*

## II.

With this statutory background, we turn to the question of whether improperly rejected absentee ballots are within the scope of errors subject to correction by a county canvassing board under Minn.Stat. § 204C.39, or must the resolution of whether those ballots were validly cast for

the office await an election contest proceeding under Minn.Stat. ch. 209. Petitioners seek to prevent the State Canvassing Board from including in its recount certification any amended results from county canvassing boards that determined that absentee ballot return envelopes had been improperly rejected by local election officials. We consider first whether there is authority for the State Canvassing Board to accept such amended election returns, which in this case turns on the authority of county canvassing boards to amend their returns at this stage of the election process—that is, after the State Canvassing Board has canvassed the original returns and a mandatory administrative recount is under way.

The December 10 letter from the Attorney General's Office to the State Canvassing Board opined that Minn.Stat. § 204C.39 is an available mechanism for the correction of erroneous rejections of absentee ballot return envelopes. As described earlier, Minn.Stat. § 204C.39 permits county canvassing boards that have already reported the results of their canvasses to the State Canvassing Board to identify "an obvious error in the counting or recording of the votes" and provides a process by which such errors can be corrected. Thus, a threshold issue in the case is whether the erroneous rejection of an absentee ballot return envelope on election night is "an obvious error in the counting or recording of the votes" that can be addressed under section 204C.39. We conclude that it is not.

The authority of county canvassing boards under section 204C.39 is limited to correction of "obvious error[s] in the counting or recording of the votes."[6] We are not writing on a blank slate in deter-

---

**6.** Minnesota Statutes § 204C.38 is similarly limited to correction of "an obvious error in   the counting or recording of the votes."

mining what the legislature meant by "obvious error[s] in the counting or recording of the votes." In *Andersen*, we interpreted the same phrase in a predecessor statute, Minn.Stat. § 204.30, subd. 1 (1961). We explained: "The term 'obvious error' as used in our statute is one that defies exact definition. About the only definition that can be given to it is that some error *appears evident from an examination of the returns made by the various precincts*." *Andersen*, 264 Minn. at 261, 119 N.W.2d at 5 (emphasis added). This interpretation limiting the scope of errors subject to correction by county canvassing boards to those "evident from an examination of the returns made by the various precincts" applies to the current statute, section 204C.39, as well. This application is based on the presumption that "when a court of last resort has construed the language of a law, the legislature in subsequent laws on the subject matter intends the same construction to be placed upon such language." Minn.Stat. § 645.17(4) (2008).

The question, then, is whether an error in rejection of an absentee ballot "appears evident from an examination of the returns made by the various precincts." Determination of whether an absentee ballot was correctly rejected would require examination, at a minimum, of the absentee ballot

return envelope, but those envelopes are not part of the "returns" made by the precincts. We have defined "returns" as "an official statement of votes cast at an election, transmitted to some authorized custodian, for the purpose of being canvassed by some proper authority." *State ex rel. Thompson v. Common Council*, 25 Minn. 106, 108–09, 1878 WL 3561, at **2 (1878). Therefore, in this context, "returns" made by the precincts means the results of the counting of votes in the precinct, as recorded on precinct summary statements required by statute. This is confirmed by the statutory process and the use of "returns" in those statutes.

After the votes marked on the ballots have been counted, the precinct election judges are directed to "write the number in the proper place on the summary statements." Minn.Stat. § 204C.21 (2008). The precinct election judges are required to complete three copies of the summary statements, Minn.Stat. § 204C.24, subd. 1 (2008),[7] and each set of completed summary statements is then placed in an envelope and sealed, *id.*, subd. 2. These envelopes are required to be labeled as "Summary statements *of the returns* of the ... election precinct." *Id.* (emphasis added). The envelopes containing the summary statements of the returns, along with separate sealed envelopes containing the ballots counted and the blank and spoiled

---

7. The summary statements must contain the following information:
    (a) the number of votes each candidate received or the number of yes and no votes on each question, the number of undervotes or partially blank ballots, and the number of overvotes or partially defective ballots with respect to each office or question;
    (b) the number of totally blank ballots, the number of totally defective ballots, the number of spoiled ballots, and the number of unused ballots;
    (c) the number of individuals who voted at the election in the precinct;

    (d) the number of voters registering on election day in that precinct; and
    (e) the signatures of the election judges who counted the ballots certifying that all of the ballots cast were properly piled, checked, and counted; and that the numbers entered by the election judges on the summary statements correctly show the number of votes cast for each candidate and for and against each question.
Minn.Stat. § 204C.24, subd. 1.

ballots, are delivered by the precinct election judges to the county auditor's office (or to the municipal clerk for transmittal to the auditor's office). Minn.Stat. § 204C.27 (2008).

The county canvassing boards then meet to "canvass the general election returns delivered to the county auditor." Minn. Stat. § 204C.33, subd. 1. The "returns" are the numbers in the precinct summary statements that had been delivered to the county auditor, and the "canvass" is simply the compilation and reporting of those numbers. *See State ex rel. Thompson*, 25 Minn. at 108–09, 1878 WL 3561, at **2 ("With reference to the analogies of our general statutory law respecting the canvassing of votes cast at elections, the word 'returns' is entitled to be taken as meaning an official statement of votes cast at an election, transmitted to some authorized custodian, for the purpose of being canvassed by some proper authority."); *see also Moon v. Harris*, 122 Minn. 138, 141–43, 142 N.W. 12, 13–14 (1913) (referring separately to "ballots" and "returns," and stating: "The official returns are evidence of the votes cast. The presumption is that they correctly state the result of an accurate count of the ballots."). This is also evidenced by the symmetry between the information that Minn.Stat. § 204C.24, subd. 1, requires in the precinct summary

statements (see footnote 7, *supra*) and the composite information that Minn.Stat. § 204C.33, subd. 1, requires county canvassing boards to report.[8] Indeed, the county canvassing board report required by section 204C.33, subd. 1, must be sent to the Secretary of State in an envelope labeled "Election Returns." Minn.Stat. § 204C.37.

▮ Thus, the "canvass" of "returns" by the county canvassing board is a narrow process, limited to compilation and reporting of numbers contained in the precinct summary statements. This limited scope is consistent with our long-standing holding that the function of canvassing election returns is ministerial. *See Hunt v. Hoffman*, 125 Minn. 249, 254, 146 N.W. 733, 735 (1914) (citing *O'Ferrall v. Colby*, 2 Minn. 180 (Gil.148) (1858)).

This ministerial function of canvassing the returns entails review only of the precinct summary statements of returns, not examination of actual ballots. Although each precinct's counted ballots, as well as their blank and spoiled ballots, are delivered to the county auditor along with the summary statement of returns, each in separate sealed envelopes, the legislature has authorized the county canvassing boards to have access only to the summary statements.[9] Minnesota Statutes

---

8. Each county canvassing board must prepare a report that states:

> (a) the number of individuals voting at the election in the county and in each precinct;
> (b) the number of individuals registering to vote on election day and the number of individuals registered before election day in each precinct;
> (c) the names of the candidates for each office and the number of votes received by each candidate in the county and in each precinct, including write-in candidates for state and federal office who have requested under section 204B.09 that votes for those candidates be tallied;

> (d) the number of votes counted for and against a proposed change of county lines or county seat; and
> (e) the number of votes counted for and against a constitutional amendment or other question in the county and in each precinct.

Minn.Stat. § 204C.33, subd. 1.

9. It is apparent from the requirements of Minn.Stat. § 204C.28 that the ballots are delivered to the county auditor so there is a central repository for safe-keeping of those materials, rather than to facilitate their inspection by canvassing boards. For example, Minn.Stat. § 204C.28, subd. 1, provides that

§ 204C.28, subd. 1, provides that "[t]he envelopes [containing ballots] may be opened by the county canvassing board if necessary to procure election returns that the election judges inadvertently may have sealed in the envelopes with the ballots." By providing that the only purpose for which a county canvassing board may open the sealed envelopes containing ballots is to retrieve the election returns, not for access to the ballots, the legislature made it clear that (a) the "election returns" are something different than the ballots delivered to the county auditor, and (b) that the normal function of the county canvassing boards does not include inspection of the ballots, which are to remain in sealed envelopes.[10]

Returning to section 204B.39, as stated in *Andersen*, "obvious error[s]" means those that "appear[ ] evident from an examination of the returns made by the various precincts." 264 Minn. at 261, 119 N.W.2d at 5. As we have seen, the returns made by the precincts means only the numbers reported on the summary statements. An error in rejection of an absentee ballot would not be evident from those reports, and in fact could not be determined without examination, at a minimum, of the absentee ballot return envelope. There is no suggestion in the statutes that county canvassing boards have

access to those envelopes as part of their ministerial canvassing function.

In addition, given both the narrow scope of returns and the ministerial function of county canvassing boards, it is not surprising that the legislature limited the errors that county canvassing boards may address under section 204C.39 to errors in "counting or recording of the votes," as that is just what is reflected in the precinct summary statements of returns that the boards review. Not only are errors in the rejection of absentee ballot return envelopes not evident from an examination of the returns, they are not errors in "counting or recording of the votes." Absentee ballot return envelopes that have been rejected, rightly or wrongly, by local election officials are not opened on election night and therefore their votes have not been "recorded." Neither are rejected absentee ballot envelopes included in the number of ballots to be counted under Minn.Stat. § 204C.20, subd. 1. Under this statute, the number of ballots to be counted on election night is the sum of the number of names entered in the election register and the number of return envelopes from *accepted* absentee ballots.[11] Because erroneous rejection of an absentee ballot envelope is not evident from an examination of the returns and because rejected absentee ballots are neither counted nor recorded,

"[a]ccess to the record [of all materials delivered] and ballots shall be strictly controlled. Accountability and a record of access shall be maintained by the county auditor during the period for contesting elections or, if a contest is filed, until the contest has been finally determined."

10. The lack of county canvassing board access to ballots is also illustrated by statutory provisions related to write-in votes. *See* Minn.Stat. § 204C.33, subd. 1. If requested under Minn.Stat. § 204B.09 (2008), the board is required to report write-in votes, which are not counted at the precinct. *Id.* But the statute provides for those votes to be counted

not by the board, but by the county auditor. *Id.*

11. The statute provides: "The election judges shall determine the number of ballots to be counted by adding the number of return envelopes from accepted absentee ballots to the number of signed voter's certificates, or to the number of names entered in the election register." Minn.Stat. § 204C.20, subd. 1. The fact that subdivision 2 of section 204C.20 requires election judges to randomly remove excess ballots if a discrepancy cannot be explained contradicts Justice Anderson's dissent's characterization of subdivision 1 as merely a "rough arithmetic check."

the erroneous rejection of an absentee ballot return envelope is outside the scope of the authority conferred by the legislature in section 204C.39 on county canvassing boards for identification of "obvious error[s] in the counting or recording of the votes."

■ In addition, even if errors in the rejection of absentee ballots were "obvious error[s] in the counting or recording of the votes," section 204C.39 would not allow county canvassing boards unilaterally to correct them. Rather, section 204C.39 would require that the county canvassing boards notify the candidates of the errors; it would then be up to the candidates to petition the district court for an order determining whether an error had been made and requiring the affected county canvassing board to first reexamine the ballots in the presence of the parties and then correct any error. Minn.Stat. § 204C.39, subds. 1 and 2.[12]

Thus, the unilateral correction by county canvassing boards of errors that may have been made in the rejection of absentee ballots is not provided for by section 204C.39, both because the type of error is beyond the scope of obvious errors in the counting and recording of ballots and because the process prescribed by the legislature requires a district court order. This does not mean the errors must remain uncorrected, but under the scheme created by the legislature, these errors are to be addressed in an election contest. While a more flexible process might be advisable as a matter of policy, as argued by the dissents, that is for the legislature to decide. Therefore, in the recount circumstances presented here, the Secretary of State and the State Canvassing Board lack authority under Minn.Stat. § 204C.39 to accept summary statements from county canvassing boards that have been amended to reflect the acceptance of previously rejected absentee ballots.

### III.

■ Petitioners further contend that the question of whether absentee ballot

12. In their dissents, Justices Anderson and Page express the view that a county canvassing board may make corrections under section 204C.39 without court involvement. Justice Anderson focuses on the provision that a report of the canvassing board after a meeting to inspect "ballots and returns" shall contain, inter alia, "a copy of the order of the court, *if any*." Minn.Stat. § 204C.39, subd. 3(a) (emphasis added). In our view, the phrase "if any" is insufficient to override the balance of the language in section 204C.39 that prescribes in detail a comprehensive process that uniformly contemplates a court finding that an error has occurred before inspection of ballots is authorized, if the candidates do not agree on the error. Justice Page asserts that in amending the statute after *Andersen*, the legislature could not have intended the "absurd" result of requiring a court hearing. Addressing the statute at issue in *Andersen*, we explained: "[I]t seems quite clear that what the legislature had in mind was to permit a correction of errors at the time the canvass was being made." 264 Minn. at 264, 119

N.W.2d at 6. Nevertheless, we held in *Andersen* that a court could allow correction of errors after completion of the initial canvass. *Id.* at 267, 119 N.W.2d at 8. Justice Murphy warned in his dissent of the potential danger of allowing county canvassing boards to voluntarily revise their returns after the completion of the initial canvass:

I cannot agree that the statute may permit a party to prevail in an election by grace of the belated action of the county canvassing board, voluntarily taken after its official return has been made. The most charitable observation of such a construction is that it permits the party with the most active and persuasive partisans to prematurely gain the advantage of a selective recount.

*Id.* at 278, 119 N.W.2d at 15 (Murphy, J., dissenting). In amending the statute after *Andersen*, the legislature could reasonably have heeded these concerns and decided as a matter of policy that "errors" found after the results of the election-night returns are known should be subject to the additional safeguard of a court hearing.

return envelopes were properly or improperly rejected can be addressed, if at all, only in an election contest under Minn. Stat. ch. 209. Minnesota Statutes § 209.02, subd. 1, allows any eligible voter or candidate to contest the election of any person to the United States Senate, among other offices. "The contest may be brought over an irregularity in the conduct of an election or canvass of votes, over the question of who received the largest number of votes legally cast, . . . or on the grounds of deliberate, serious, and material violations of the Minnesota Election Law." *Id.*

We agree with petitioners that whether absentee ballots were rejected erroneously may be addressed in an election contest under chapter 209. An error in rejecting an absentee ballot return envelope is "an irregularity in the conduct of an election" that affects "the question of who received the largest number of votes legally cast." Minn.Stat. § 209.02, subd. 1. Nevertheless, we disagree that relief must be entirely denied in this proceeding under Minn.Stat. § 204B.44.

Petitioners invoked our jurisdiction in this matter under section 204B.44, which allows us to order the correction of "any wrongful act, omission, or error of any election judge, municipal clerk, county auditor, canvassing board or any of its members, the secretary of state, or any other individual charged with any duty concerning an election."[13] The Franken campaign argues that our opinion in *Andersen* is authority for allowing county canvassing

boards to amend their returns to reflect all absentee ballots that the county canvassing boards determine were erroneously rejected on election night.

In *Andersen,* the issue was whether the State Canvassing Board could accept amended returns submitted by ten county canvassing boards, correcting errors under a predecessor statute to section 204C.39, after the county boards had submitted their initial returns, but before the State Canvassing Board had completed its canvass of the county board returns. 264 Minn. at 258–59, 119 N.W.2d at 3. The dispute in *Andersen* was about the timing of the corrections. One candidate argued that a county canvassing board was "functus officio" after completing its original canvass and could not be "revived" to correct errors. *Id.* at 264–65, 119 N.W.2d at 6–7. The other candidate urged the court to adopt a construction of the statute "permitting a county canvassing board, upon discovery of obvious errors, to reconvene and correct those errors at any time, at least until the state canvassing board meets." *Id.* at 263, 119 N.W.2d at 5.

We concluded that the statute contemplated corrections by county boards only during their initial canvass. The statute itself began with the phrase "[i]f in conducting the canvass of votes," Minn.Stat. § 204.30, subd. 1 (1961), and we explained that "[a] literal reading of the statute would justify the conclusion that in elections involving state offices the corrective action must be taken before the county board certifies its result to the secretary of

---

13. Section 204B.44's principal purpose is to provide a mechanism for correcting errors alleged to have occurred before the election, such as errors and omissions "in the placement or printing of the name or description of any candidate or any question" on the ballot and errors in preparing or printing the official ballot. Indeed, section 204B.44 is the only statutory mechanism available for the correction of ballot errors before the election. However, section 204B.44 also allows the court to correct "any wrongful act, omission, or error of any election judge, municipal clerk, county auditor, canvassing board or any of its members, the secretary of state, or any other individual charged with any duty concerning an election." Minn.Stat. § 204B.44(d).

state." *Andersen*, 264 Minn. at 262–63, 119 N.W.2d at 5. Similarly, we stated: "[I]t seems quite clear that what the legislature had in mind was to permit a correction of errors *at the time the canvass was being made.*" *Id.* at 264, 119 N.W.2d at 6 (emphasis added).

We rejected the argument that a county canvassing board could not be "revived" after its initial canvass, but not because the statute required that conclusion. Rather, we explained that the court's authority to order correction of errors under Minn.Stat. § 203.38 (1961), the predecessor to section 204B.44, should not be negated. *Andersen*, 264 Minn. at 265, 119 N.W.2d at 7 ("If the board is functus officio after having completed its original canvass, ..., it would mean that ... the court could not revive the county canvassing board in order to compel it to do any act which it had neglected to do."). We reasoned that if the legislature could provide for the court to compel a county canvassing board to correct an error after the board had adjourned, it could provide for a board to correct errors on its own after adjournment. *Id.* at 267, 119 N.W.2d at 8. But, we added "[i]t may be that § 204.30 does not go that far...." *Id.* Moreover, we observed that although the statute was silent on the point, "[i]n any construction, there should be a cutoff at that point [when the state canvassing board meets]." *Id.* at 263, 119 N.W.2d at 5–6. Here, the errors were discovered and the corrections would be made after the initial canvass by the State Canvassing Board and during an administrative recount.

Thus, in *Andersen* we did not hold that the corrections made by the county boards after their initial canvasses were authorized under the existing statute. Instead, we held that the amended returns should be considered by the State Canvassing Board, despite the fact that the timing of

their submission was not what statutory procedures would allow. That holding was based on the principle that once the true count of the votes was known, the court should not require an incorrect count to be used. *See, e.g., id.* at 273, 119 N.W.2d at 12. We observed: "As long as there is substantial compliance with our laws and no showing of fraud or bad faith, *the true result of an election, once ascertained,* ought not be defeated by an innocent failure to comply strictly with the statute." *Id.* at 267, 119 N.W.2d at 8 (emphasis added). Application of that principle necessarily was premised on our conclusion, repeated throughout the decision, that the county boards' amended returns reflected "the correct tally of the vote." 264 Minn. at 269, 119 N.W.2d at 9–10. Central to that conclusion was the lack of dispute about the accuracy of the amended results. We stated, for example, "To now hold that the results of this election must be based on the return *that everyone concedes is erroneous* would be a perversion of our whole election process...." *Id.* at 269, 119 N.W.2d at 9 (emphasis added). *See also id.* at 272, 119 N.W.2d at 11 ("[I]it appears to us that the amended returns reflect the true vote of the people. No evidence has been submitted to us to the contrary."). Although the candidates disagreed about which returns should be accepted, we explained, "[t]he objection to acceptance of the amended returns is based on technical irregularities in arriving at the result rather than on a claim that the results are not right." *Id.* at 272–73, 119 N.W.2d at 11.

In this case, local election officials have determined that some absentee ballot return envelopes were rejected in error, either for a reason other than one of the four reasons specified in Minn.Stat. § 203B.12 or because election officials were mistaken in concluding that one of the four specified reasons applied. Nei-

ther candidate has alleged, nor is there any evidence before us to suggest, that those errors were anything but innocent. But the candidates apparently do disagree whether all the identified rejections were in fact erroneous. Unlike the circumstances in *Andersen*, there is no agreement that counting all of the absentee ballots that the local election officials have designated as wrongly rejected would reflect the "true vote of the people." But where the candidates can agree with local election officials that rejection of an absentee ballot envelope was in error, correcting that error and counting the vote would, consistent with *Andersen*, provide "the correct tally of the vote."

Accordingly, we conclude that in the specific and limited circumstances where all parties—the two candidates and the relevant local election officials—agree that an absentee ballot return envelope was erroneously rejected, section 204B.44 authorizes us to allow correction of that error to reflect "the true vote of the people," and the correction need not await an election contest under chapter 209.[14] As explained above, although an election contest under chapter 209 is designed to address, among other things, "an irregularity in the conduct of an election or canvass of votes," it is an evidentiary hearing specifically designed for those irregularities as to which there are disputed issues of fact. Minn. Stat. § 209.02, subd. 1. Where all parties agree that an absentee ballot return envelope was erroneously rejected, there is no disputed issue of fact and no need for the factfinding process that an election contest under chapter 209 provides. Instead, any absentee ballot return envelope that local election officials and the candidates agree was rejected in error may be opened and

its vote for United States Senator added to the total, subject to challenge as to voter intent by either candidate.

We therefore grant in part and deny in part the petition for relief under Minn. Stat. § 204B.44, as stated in our order of December 18, 2008, as modified by our order of December 24, 2008.

MAGNUSON, C.J., and ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

## DISSENT

ANDERSON, PAUL H., Justice (dissenting).

> It's not the voting that's democracy,
> it's the counting.

> Tom Stoppard, *Jumpers* (1972) act I.

I respectfully dissent. I disagree with the majority's decision to enjoin county canvassing boards from including any previously rejected absentee ballots in the administrative recount. I appreciate the majority's efforts to see that the results of the election reflect "the true vote of the people." We all share the goal that the results of this election be accurate. But the majority's decision to bar county canvassing boards from performing their legal duties—including determining whether the election judges erroneously rejected ballots on election night—does little to achieve an accurate count of validly cast votes. I conclude that the majority opinion misreads Minnesota's election laws, is internally inconsistent, and improperly gives the candidates significant control over a citizen's fundamental right to have his or her validly cast vote counted.

**14.** We note that unlike the process prescribed by the legislature in Minn.Stat. § 204C.38 for correction of obvious errors in the counting or recording of ballots, we do not authorize correction based solely on the agreement of the candidates. We require the agreement also of the local election officials that an error was made.

In a democracy, the right to have one's validly cast vote counted is as important as the act of voting itself.

It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote and to have their votes counted, *United States v. Mosley,* 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355. In *Mosley* the Court stated that it is "as equally unquestionable that the right to have one's vote counted is as open to protection ... as the right to put a ballot in a box." 238 U.S. at 386[, 35 S.Ct. 904]. The right to vote can neither be denied outright, nor destroyed by alteration of ballots, nor diluted by ballot-box stuffing. As the Court stated in *[U.S. v. ]Classic,*[ 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) ] "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted.... The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.

*Reynolds v. Sims,* 377 U.S. 533, 554–55, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (citations omitted) (footnote omitted).

Our review in this case "must be informed by the recognition that '[n]o right is more precious in a free country than having a voice in the election of those who make the laws under which, as good citizens, we must live'" and that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." *Erlandson v. Kiffmeyer,* 659 N.W.2d 724, 729 (Minn.2003) (quoting *Burson v. Freeman,*

504 U.S. 191, 199, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)). We have long held that in order to protect this fundamental right, election laws should be liberally construed. In *Quealy v. Warweg,* in reference to an election law, we said that "[t]he statute must be liberally construed so as to effectuate legislative intention and to fully secure to the people their right to express their choice." 106 Minn. 145, 146, 118 N.W. 673, 673 (1908); *see also Petersen v. Holm,* 243 Minn. 38, 40, 66 N.W.2d 15, 16 (1954). "A technical construction of the language used would be objectionable on general principles, and tend to subvert the purposes sought to be attained." *Dougherty v. Holm,* 232 Minn. 68, 71–72, 44 N.W.2d 83, 85 (Minn.1950); *Quealy,* 106 Minn. at 146, 118 N.W. at 673. The majority's decision today is inconsistent with these general principles.

The majority concludes that the erroneous rejection of an absentee ballot return envelope is not an error in "the counting or recording of the votes for an office" and therefore cannot be corrected under Minn. Stat. § 204C.39 (2008). The majority further concludes that, even if the erroneous rejection of an absentee ballot return envelope is an error in "the counting or recording of the votes for an office," section 204C.39 does not authorize a county canvassing board to unilaterally amend its canvass to correct such an error but rather requires an order of the district court directing the affected county canvassing board to first reexamine the ballots. Finally, the majority observes that errors in rejecting absentee ballots may be addressed in an election contest under Minn. Stat. ch. 209 (2008).

I disagree with the majority on at least three main points. First, I disagree with the majority's definition of "counting or recording of the votes for an office." Second, I disagree with the majority's con-

struction of section 204C.39 as requiring a court order before a county canvassing board can correct any errors. Finally, I question the practicality of the majority's observation that such errors can be addressed in an election contest under Minn. Stat. ch. 209.

The majority's result is based, first, on an exceedingly narrow definition of the phrase "obvious errors in the counting or recording of the votes for an office" as used in Minn.Stat. § 204C.39. The majority concludes that because under Minn.Stat. § 204C.20, subd. 1 (2008), rejected absentee ballots are not counted and their votes are not recorded on election night, an error in deciding to reject an absentee ballot return envelope in the first place is not an "error in counting or recording of the votes." [1] The majority's reliance on Minn. Stat. § 204C.20 is misplaced. According to section 204C.20, the number of ballots to be counted on election night is the sum of "the number of return envelopes from accepted absentee ballots" and "the number of signed voter's certificates" (or "the number of names entered in the election register"). *Id.* Section 204C.20 must be understood for what it is—a rough arithmetic check to be used by election judges on election night and no more. [2]

Second, there is no indication in section 204C.20 that it applies to county canvassing boards under Minn.Stat. § 204C.33 (2008). Under Minn.Stat. § 204C.33, subd. 1 (2008), the county canvassing board meets after the general election to "canvass the general election returns delivered to the county auditor." Two aspects of the plain language of section 204C.33 indicate that section 204C.20 does not apply to county canvassing boards: the meaning of "canvass" and the meaning of "general election returns."

"Canvass" is not defined in Minnesota law, but *Black's Law Dictionary* provides two definitions relevant here—"to examine in detail; scrutinize" and "to formally count ballots and report the returns." *Black's Law Dictionary* 220 (8th ed.2004). In addition, *Black's* provides a very relevant example:

When all the ballots have been collected, including those of the presiding officer, the secretary, and the tellers, the ballots are canvassed by the tellers. *Canvassing* the ballots means more than just counting. It includes evaluating ballots to identify those that are invalid, blank, cast for illegal nominees, illegible, abstaining, and the like, and reporting the total results to the presiding officer for his announcement of the results.

---

1. Minnesota Statutes § 204C.20, subd. 1, provides:
   The election judges shall determine the number of ballots to be counted by adding the number of return envelopes from accepted absentee ballots to the number of signed voter's certificates, or to the number of names entered in the election register. The election judges shall then remove all the ballots from the box. Without considering how the ballots are marked, the election judges shall ascertain that each ballot is separate and shall count them to determine whether the number of ballots in the box corresponds to the number of ballots to be counted.

2. The majority disagrees with characterization of this arithmetic check as "rough," noting that section 204C.20, subd. 2, requires election judges to randomly remove excess ballots in order to count only as many ballots as their arithmetic indicates should be counted. Op. at 229 n. 11. I agree that section 204C.20 limits election judges to counting only as many ballots as their arithmetic indicates should be counted and, in that sense, the section requires precision. But precision should not be confused with accuracy and it is in that sense that I characterize the arithmetic check as "rough."

*Id.* (quoting Ray E. Kessey, *Modern Parliamentary Procedure* 113 (1994)). Under the foregoing definition of "canvass," it is the duty of county canvassing boards to "evaluat[e] ballots to identify those that are invalid, blank, cast for illegal nominees, illegible, abstaining, and the like." As the majority notes, Minn.Stat. § 203B.12, subd. 2 (2008), requires that rejected absentee ballot return envelopes—and presumably the ballots inside—be "returned" to the county auditor on election night. Surely the purpose of that requirement is to make such return envelopes and their ballots available for inspection by the county canvassing board. *See* Minn.Stat. § 204C.33, subd. 1 ("the board shall promptly and publicly canvass the general election *returns* delivered to the county auditor." (emphasis added)). The majority's narrow limits on the authority of county canvassing boards is inconsistent with the meaning of "canvass" as this word is used in section 204C.33.

Furthermore, the county canvassing boards are to canvass "the general election returns delivered to the county auditor." The majority announces that "returns" means "the results of the counting of votes in the precinct, as recorded on precinct summary statements required by statute," noting among other things that on election night precinct judges are to complete "summary statements" and place them in an envelope labeled "Summary statements of the returns of the . . . precinct." In other words, the majority limits the meaning of election "returns" to the summary statements filled out by election judges on election night.

But a "summary" of something is not the thing itself. Minnesota Statutes § 204C.24, subd. 1, calls what is filled out on election night a "summary statement" of the returns. A summary of the returns should not be mistaken for *the returns themselves.* This point is supported by the legislature's references to both the "summary statements" and the "returns" in Minn.Stat. § 204C.28, subd. 1 (2008). Under subdivision 1 of section 204C.28, every county auditor is to remain at the auditor's office on election night in order to, among other things, "receive delivery of the returns" and "permit public inspection of the summary statements." In construing statutes, we are to assume that when the legislature uses different words in the same context, as it does here, it intends them to mean different things. *Transp. Leasing Corp. v. State,* 294 Minn. 134, 137, 199 N.W.2d 817, 819 (1972).

Contrary to the majority's narrow definition of election "returns," I read subdivision 1 of section 204C.28 as including in "returns" everything that is delivered to the county auditor on election night. For example, ballots are to be delivered to the county auditor's office on election night. Minn.Stat. § 204C.27 (2008). Significantly, rejected absentee ballot return envelopes are also to be delivered to the county auditor. Minn.Stat. § 203B.12, subd. 2 (2008). Therefore, rejected absentee ballots are among the "returns" that the county auditor is to receive on election night. Given this statutory language, I conclude that rejected absentee ballot envelopes are plainly among the "general election returns delivered to the county auditor" that the county canvassing board is to "promptly and publicly canvass" under Minn.Stat. § 204C.33, subd. 1.[3]

---

**3.** I acknowledge that, as the majority points out, county canvassing boards are authorized under Minn.Stat. § 204C.28, subd. 1, to open the sealed envelopes of ballots to retrieve "election returns" that local election judges may have sealed in the envelopes with the ballots. The majority believes this provision authorizes county canvassing boards to remove only summary statements that may have been placed in the ballot envelopes. But I

Even if the language of section 204C.33 in this respect were not plain, a simple example illustrates the fundamental problem with the majority's reliance on section 204C.20 to limit the authority of the county canvassing board. Section 204C.20 requires election judges to remove all the ballots from the ballot box on election night, count them, and compare that total to the arithmetic sum of "the number of return envelopes from accepted absentee ballots" and "the number of signed voter's certificates" (or "the number of names entered in the election register"). *Id.*, subd. 1. If there are more ballots in the box than this arithmetic sum indicates, the election judges are to put all of the ballots back into the box and then randomly withdraw ballots from the box until the number of ballots in the box equals the number of ballots to be counted. *Id.*, subd. 2. The ballots so withdrawn from the ballot box are not counted on election night, *id.*, subd. 3, but are preserved and returned to the county auditor, *id.*, subd. 4.

What if the election judges miscounted the number of return envelopes from accepted absentee ballots or miscounted the number of names entered in the election register, as a result of which the election judges withdrew ballots from the ballot box unnecessarily? The ballots unnecessarily withdrawn from the ballot box on election night were not counted, and the

votes on those validly cast ballots were not recorded, all because of a mistake by election judges. It is difficult to imagine a more "obvious error," yet under the majority's definition of "counting or recording of the votes" this is an error that cannot be corrected by the county canvassing board.[4] Nevertheless, section 204C.20, subd. 4, requires those erroneously withdrawn ballots to be preserved and sent to the county auditor. Because the erroneously withdrawn ballots are returned to the county auditor, I conclude that they are also part of "the general election returns" available to the county canvassing board under Minn.Stat. § 204C.33, subd. 1. Indeed, I believe the reason for this requirement is obviously to allow the county canvassing board to correct such an error as part of its "canvass [of] the general election returns delivered to the county auditor."

Not only is the majority's narrow construction of "counting or recording" contrary to statute, it is also contrary to our long-standing precedent and to the principles on which that precedent is based. In *Andersen*, we observed that to hold that the results of that election "must be based on the return that everyone concedes is erroneous would be a perversion of our whole election process in the pursuit of strict adherence to statutes that need not be so strictly construed." 264 Minn. at 269, 119 N.W.2d at 9. Yet, the majority's

read the statute literally—that is, section 204C.28, subd. 1, allows county canvassing boards to retrieve anything constituting an "election return," other than the ballots themselves, that may have been inadvertently sealed in the ballot envelope.

4. The court's limited definition of "counting or recording" necessarily applies not just to Minn.Stat. § 204C.39, but also to Minn.Stat. § 204C.38 (2008), which allows canvassing boards to correct errors agreed to by the candidates. Section 204C.38 limits the errors to which the candidates can agree to "obvious error[s] in the counting or recording of the

votes." Because the court concludes that the erroneous rejection of absentee ballots is not an error in "counting or recording of the votes," under the majority's ruling a county canvassing board cannot amend its vote totals to reflect absentee ballots that were rejected in error, even if the candidates agree. I further note that if the election judges correctly added figures that were themselves erroneous, then the county canvassing board would not be able to detect this error if it could review only the summary statement of the returns.

construction of "counting or recording" does exactly that. The decision allows election returns that no one can reasonably agree reflect all validly cast votes to stand unless the disenfranchised voters petition the courts for redress in an election contest. In *Andersen* we observed that the purpose of the predecessor of Minn.Stat. § 204C.39 "obviously was to permit correction at the county level of obvious errors committed by the precinct judges in order to avoid the necessity of an election contest where possible." *Andersen,* 264 Minn. at 262, 119 N.W.2d at 5 (citing Minn.Stat. § 204.30 (1961)). I conclude that under the statutory scheme in place, it does not and should not fall to the courts of this state to correct errors that other branches of government acknowledge exist.

Although the majority finds support for its narrow definition of "error[s] in counting or recording" in *Andersen,* I read *Andersen* quite differently. Again, the majority holds that a county canvassing board lacks statutory authority to consider anything beyond the summary statements filled out by local election officials on election night. Yet our decision in *Andersen* countenanced county canvassing boards doing far more than that.

*Andersen* concerned the 1962 gubernatorial election, in which the original tabulation of votes showed Karl Rolvaag as receiving more votes than Elmer L. Andersen. 264 Minn. at 258, 119 N.W.2d at 3.[5] Ten county canvassing boards reconvened, retabulated the results of the elec-

tion in certain precincts, and certified the retabulated results of those recanvasses to the Secretary of State. *Id.* If, as the majority suggests, *Andersen* limited county canvassing boards to considering only the summary statements prepared by local election officials on election night, then the ten counties that determined there had been "obvious error[s] in the counting and recording of the vote[s]" in the 1962 gubernatorial race, *see* Minn.Stat. § 204.30, subd. 1. (1961), could lawfully have done so based only on the summary statements prepared by local election officials on election night in November 1962.

But that is not what happened. At least one county reached the conclusion that there had been an error in "the counting and recording of the vote" based on evidence that the majority excludes from the election "returns." In Grant County, 31 absentee ballots were not originally counted because they had been "delivered into the hands of the election judges personally instead of being placed in the United States mail," *Andersen,* 264 Minn. at 260, 119 N.W.2d at 4, as Minnesota law then required. *See* Minn.Stat. § 207.11 (1961) ("The judges in the several precincts at any election shall receive all ballots delivered to them on election day by officers or employees of the United States postoffice department in due course of the business of that department. . . ."). Under the majority's holding in this case, the error in rejecting those 31 absentee ballots—which

---

5. The provisions of Minnesota election law applicable to the 1962 election were not substantially different from those applicable to this election. The statute prescribed how many ballots election judges were to count on election night. *See* Minn.Stat. § 204.20, subd. 1 (1961) (requiring election judges to "determine whether the number of ballots corresponds with the number that the election register or registration file shows were cast"). After counting the ballots, election judges

were to prepare "a summary statement" and deliver it to the county auditor. Minn.Stat. § 204.25 (1961). The county canvassing board was to "publicly canvass the returns of the election made to the county auditor." Minn.Stat. § 204.29, subd. 2 (1961). Finally, Minn.Stat. § 204.30 (1961) allowed a county canvassing board to determine that there had been "an obvious error in the counting and recording of the vote for any particular office."

had been neither counted nor recorded on election night—was not an "error in counting or recording of the votes" that could have been corrected by the county canvassing board because the error would not have been apparent from the summary statement of the returns. Nevertheless, as our opinion in *Andersen* reports, the Grant County canvassing board, "upon reconvening, considered the return of the ballots proper and counted them." 264 Minn. at 260, 119 N.W.2d at 4.[6] If we are to be true to not just the spirit but the letter of *Andersen,* we must similarly allow county canvassing boards to address errors with respect to rejected absentee ballots here.

In contrast to the majority's narrow definition of "counting or recording," I conclude that an error in rejecting an absentee ballot is an error in *both* counting *and* recording a validly cast vote. Errors in "counting" must necessarily include errors in deciding *what* to count, just as errors in "recording" must necessarily include errors in deciding *what* to record. The erroneous rejection of an absentee ballot is an error in both *counting* and *recording* the vote because, if validly cast absentee votes are not counted and votes that have been validly cast are not recorded, the resulting vote totals cannot accurately reflect "the true vote of the people."

My second area of disagreement with the majority is in its interpretation of the process established by Minn.Stat. § 204C.39. The majority concludes that section 204C.39 does not allow a county canvassing board to unilaterally amend its results, even for the most obvious of errors "in counting or recording the votes."

Rather, according to the majority, section 204C.39 allows a county canvassing board to amend its results only in response to a court order, obtained at the initiative of one of the candidates. In other words, under the majority's interpretation, one of the candidates must always petition for and obtain a court order before a county canvassing board can amend its results under section 204C.39.

Section 204C.39 *permits* a county canvassing board to reexamine its election results in response to a court order, but I do not read section 204C.39 as *requiring* a court order. Subdivision 3 of section 204C.39 calls upon a county canvassing board, after re-inspecting the ballots and returns, to submit to the county auditor an addendum to its regular report, which is to include the minutes of the canvassing board's meeting, a copy of the meeting notice given to the candidates, the total number of votes received by each candidate, and "a copy of the order of the court, *if any.*" Minn.Stat. § 204C.39, subd. 3 (emphasis added). The majority dismisses the phrase "if any," deeming it "insufficient to override the balance of the language in section 204C.39." Op. at 230 n. 12. But in construing a statute, our task is not to ignore that which is inconsistent, but to reconcile inconsistencies when we can. *Lowry v. City of Mankato,* 231 Minn. 108, 113, 42 N.W.2d 553, 557–58 (1950). Therefore, I conclude that section 204C.39 contemplates a situation in which the county canvassing board may re-inspect the ballots and amend its reported vote totals in the absence of a court order requiring it to do so.

---

**6.** Not only did one of the ten counties correct an error in "counting or recording" of the votes by counting and recording ballots that had not previously been counted, but another of the ten determined that an error had been made in counting or recording of the votes based on the affidavits of two election judges. *Andersen,* 264 Minn. at 260, 119 N.W.2d at 4 (noting that in Morrison County, a transposition in the totals for the two candidates was called to the attention of the county canvassing board by affidavits of two election judges).

Thirdly, I disagree, as a practical matter, with the majority's observation that errors in rejecting absentee ballots are to be corrected in an election contest under Minn.Stat. ch. 209. Although Minn.Stat. § 209.02, subd. 1 (2008), allows "[a]ny eligible voter" to commence an election contest, I can find no mechanism under Minnesota law for a voter who cast an absentee ballot to find out whether his or her vote was ever counted. How, then, would a voter whose absentee ballot envelope was improperly rejected know that he or she must file an election contest to have his or her vote counted—much less to do so within seven days of the completion of the canvass, as Minn.Stat. § 209.021, subd. 1 (2008) requires? Further, an election contest filed over the erroneous rejection of an absentee ballot would presumably require the inspection of the absentee ballot return envelope. But it is not clear under the majority's application of Minn. Stat. § 204C.20 and its narrow definition of "canvass" that a rejected absentee ballot envelope is within the scope of the ballots that can be inspected under Minn.Stat. § 209.06. See Minn.Stat. § 209.06, subd. 3 (2008) (providing for "recanvass [of] the votes cast for the parties to the contest").

At this point, it is appropriate to give another example of why an obvious error in counting or recording absentee ballots can, and should, be addressed by a county canvassing board before the State Canvassing Board certifies a winner in the United States Senate election. This error in counting or recording appears in the documents submitted to us in this case. Two voters, residing at the same address in a metro area suburb, cast absentee ballots in the November 4 election, but their ballots were rejected. The reason given for the rejection is listed as code number

"3." Code number 3 is described under the "Reason Code Description" as being: "The voter was not registered and eligible to vote in the precinct or has not included a properly completed voter registration application." This reason for rejection tracks with Minn.Stat. § 203B.12, subd. 2(3) (2008), which provides that for an absentee ballot to be marked "Accepted" election judges must be satisfied that "the voter is registered and eligible to vote in the precinct or has included a properly completed voter registration application in the return envelope." Thus it appears that the two voters' absentee ballots were rejected because the voters were not registered to vote.

Yet there is evidence, which should have been readily available to the county canvassing board, that these two voters were properly registered to vote. The Secretary of State's voter identification record shows that both voters were not only registered voters but diligent voters. One has voted in every primary and general election since 1994, as well as a special election and a school board election.[7] The other has voted in all general elections since 1994, all but two primary elections since that date, and several local elections.[8] In all of these elections, both voted in person and most recently they voted in person in the primary election held on September 9, 2008.

Nevertheless, the ballots of these two voters were rejected, and their votes were not counted. Based on the foregoing information, the election judges' rejection of these ballots can only be described as the result of an "obvious error in counting or recording." Not only were their votes not counted for the Senate race, but also they were not counted for any other race for

---

7. See Addendum for voting record of first voter.

8. See Addendum for voting record of second voter.

which their votes were validly cast. I believe that these voters, who have in the past been conscientious and diligent in exercising their enfranchised right, would be both surprised and chagrined to know that their votes have not been counted due to obvious human error. Further, their trust and confidence in our voting system may well be significantly undermined if they learn that, as a result of an obvious error, their absentee ballots were not only rejected but that, once the error was discovered, Minnesota law, as interpreted by the majority, does not allow the county canvassing board to simply correct the error.[9] Again, I wonder how, as a practical matter, these voters will ever learn their ballots were rejected, much less do so within seven days of the completion of the canvass, as Minn.Stat. § 209.021, subd. 1, requires. Then, even if they were to timely learn that their ballots were rejected, the only way they get their votes counted under the majority opinion would be for them to commence an election contest.

I have three concluding observations. First, under Minnesota's election system, county canvassing boards are given considerable authority and discretion to fulfill their duty to accurately count votes validly cast in an election. As indicated above, I conclude that Minnesota's statutory scheme allows county canvassing boards to correct obvious errors before the State Canvassing Board certifies a winner in any given election. I do not understand why petitioners Norm Coleman, et al., were so reluctant to have this statutory scheme take its normal course. This process allows the State Canvassing Board to reach a result without excluding votes that are obviously cast in a valid manner.

Second, I am concerned by what I see as an inconsistency in the majority's opinion, which narrowly construes the term "counting or recording errors"—thus limiting the ability of county canvassing boards to deal with anything other than arithmetic errors—but nevertheless directs two of the candidates to make every attempt to agree unanimously as to what errors in counting or recording have been made in counting absentee ballots. Again, I appreciate the majority's attempt to see that some of the improperly rejected absentee ballots were counted. But the remedy it has provided was not requested by the parties, and I am not sure it can be properly ordered by the court under Minn.Stat. § 204B.44 (2008). Moreover, the inquiry ordered by the majority and the process that this inquiry involves obviously extends beyond the majority's interpretation of what a county canvassing board is legally authorized to do. The majority has essentially issued a directive that cannot be fulfilled by county canvassing boards in light of the majority's narrow interpretation of the phrase "counting or recording."

Third, I take issue with the majority's position to, in essence, assign to two of the competing candidates—Norm Coleman and Al Franken—the decision as to which ballots are to be counted, while at the same time forbidding duly appointed election officials from correcting obvious counting or recording errors on their own. The majority holds that if Coleman and Franken agree that an absentee ballot should be counted, then that ballot can be counted; but, if either candidate objects, the objecting candidate has veto power over whether the vote is counted by the State Canvassing Board. What the majority has done is subordinate a citizen's right

9. I note that under section 204C.39, subd. 1, if a candidate disagrees with the decision made by the county canvassing board, the candidate may without unreasonable delay apply to the district court for relief.

to vote in Minnesota's 2008 United States Senate contest—the right of that citizen to have his or her vote counted—to the post-election strategy of the candidates. It makes no sense to me that in our democratic society, we would give any candidate veto power over whether a citizen's vote will be counted. That decision should and must rest with the duly authorized election officials and the State Canvassing Board.

The majority's directive, which I conclude lacks statutory authority, is particularly troublesome given the sophisticated voter information now available to political candidates and campaigns. Nowadays, it is not unusual for campaigns and political parties to have detailed information on voters, such as what elections—be it general, primary, local, or special—the voter participated in over a period of several years and how the voter responded to polling surveys. From this information, candidates and political parties can create a profile as to the likely party or candidate the voter prefers. The majority opinion has created the likely scenario that the candidates will take the power the majority has handed to them, combine it with their voter information, and use it as a tactical tool in their hard-fought contest for votes.[10]

A decision placing ultimate control over whether a citizen's vote is to be counted by the State Canvassing Board in the hands of the candidates leads to an untenable result. As the quote at the beginning of my dissent says: "It's not the voting that's democracy, it's the counting." I conclude that Minnesota has a statutory scheme in place to ensure that all validly cast votes are counted and recorded by local election officials and the State Canvassing Board

and which allows that an "obvious error in the counting or recording of the vote" can and will be corrected after the initial canvass is completed. This statutory scheme is in place so that we can "avoid the necessity of an election contest where possible," *Andersen,* 264 Minn. at 262, 119 N.W.2d at 5 (citing Minn.Stat. § 204.30 (1961)). It also avoids the "perversion" of an "election process" based on returns that "everyone concedes [are] erroneous." *Id.* at 269, 119 N.W.2d at 9. The majority's decision does not permit this statutory scheme to work and it is for this reason I must dissent.

## ADDENDUM

Voting record of first voter:

| ELECTION DATE | ELECTION DESCRIPTION |
| --- | --- |
| 09/14/2004 | STATE PRIMARY |
| 11/06/2001 | SCHOOL DISTRICT ELECTION |
| 11/05/2002 | STATE GENERAL ELECTION |
| 09/10/2002 | STATE PRIMARY |
| 11/02/2004 | STATE GENERAL |
| 09/12/2000 | STATE PRIMARY ELECTION |
| 11/07/2000 | STATE GENERAL |
| 09/15/1998 | STATE PRIMARY ELECTION |
| 11/03/1998 | STATE GENERAL |
| 09/10/1996 | STATE PRIMARY ELECTION |
| 11/05/1996 | STATE GENERAL |
| 11/07/1995 | SCHOOL BOARD ELECTION |
| 09/13/1994 | STATE PRIMARY ELECTION |
| 11/08/1994 | STATE GENERAL |
| 07/13/1993 | SPECIAL ELECTION |
| 11/04/2003 | GENERAL ELECTION |
| 09/12/2006 | STATE PRIMARY |
| 11/07/2006 | STATE GENERAL |
| 09/09/2008 | STATE PRIMARY |

Voting record of second voter:

| ELECTION DATE | ELECTION DESCRIPTION |
| --- | --- |
| 09/14/2004 | STATE PRIMARY |
| 11/06/2001 | SCHOOL DISTRICT ELECTION |
| 11/05/2002 | STATE GENERAL ELECTION |
| 09/10/2002 | STATE PRIMARY |
| 11/02/2004 | STATE GENERAL |
| 11/07/2000 | STATE GENERAL |
| 09/15/1998 | STATE PRIMARY ELECTION |
| 11/03/1998 | STATE GENERAL |
| 11/05/1996 | STATE GENERAL |
| 09/13/1994 | STATE PRIMARY ELECTION |
| 11/08/1994 | STATE GENERAL |
| 11/04/2003 | GENERAL ELECTION |
| 09/12/2006 | STATE PRIMARY |
| 11/07/2006 | STATE GENERAL |
| 09/09/2008 | STATE PRIMARY |

**10.** I acknowledge that in its order of December 18, 2008, the majority recognized this potential problem and reminded the parties of "their obligations under Minn. R. Civ. P. 11."

Nevertheless, I do not believe that reminder has necessarily prevented the problem that I anticipated would arise.

PAGE, Justice (dissenting).

I join in the dissent of Justice PAUL H. ANDERSON.

### DISSENT

PAGE, Justice (dissenting).

I join Justice Paul Anderson's dissent. I write separately to briefly make four additional points and to emphasize three points made by Justice Anderson. The four additional points I want to make are:

1. The court misconstrues the meaning of *Andersen*.

While the court cites to *In re Andersen*, 264 Minn. 257, 261–62, 119 N.W.2d 1, 5 (1962), as part of the justification for its decision, *Andersen*, in fact, does not support that decision. Nor does it support the court's narrow construction of Minn. Stat. § 204C.39. To the contrary, *Andersen* supports the proposition that election laws are to be liberally construed and that county canvassing boards have the authority to correct obvious errors such as the ones alleged here. And, *Andersen* provides no support at all for the proposition that this court can reject the statutory scheme in favor of its own scheme for counting improperly rejected absentee ballots—a scheme, which, by its nature, ensures that some number of validly cast ballots will be excluded when the election results are certified.

Further, to the extent that the court relies on the statement in *Andersen* that the parties agreed that the election results were erroneous, I note that the parties in *Andersen*, while agreeing that there were errors, disagreed over what the errors were and the process to be used to correct them. *Andersen*, 264 Minn. at 258–59, 119 N.W.2d at 3; *see also* Ronald F. Stinnett & Charles H. Backstrom, *Recount* 66–83

(Nat'l Document Publishers, Inc.1964). Reminiscent of what has taken place in this case, at least one of the parties in *Andersen* argued that errors should be corrected when the correction inured to his benefit while at the same time attempting to preclude corrections that adversely affected him. 264 Minn. at 269, 119 N.W.2d at 9–10. It appears that the action in *Andersen* was brought for that very reason.

To the extent that the court relies on the fact that the parties in *Andersen* objected to the State Canvassing Board counting amended results submitted by county canvassing boards because of "technical irregularities in arriving at the result rather than on a claim that the results are not right," *id.* at 272–73, 119 N.W.2d at 11, the court takes the *Andersen* reference to "technical irregularities" out of context. The *Andersen* court permitted county canvassing boards to correct obvious errors and submit amended returns to the Secretary of State. *Id.* It then concluded that the State Canvassing Board could accept the amended county returns. *Id.* at 273, 119 N.W.2d at 12. The *Andersen* court placed the burden on the party attacking the amended returns to show that the corrections did not reflect the true vote. *Id.* at 272, 119 N.W.2d at 11. Thus, it was in this context that the *Andersen* court concluded that the attacking party only objected based on "technical irregularities" and not on claims that the results were inaccurate. *See id.* Therefore, the court permitted the amended returns to be counted in *Andersen*. Here, as in *Andersen*, both parties agree that some absentee ballots were rejected in error. And, as in *Andersen*, even though the Coleman and Franken parties cannot agree on which specific ballots were improperly rejected or on the proper process to correct those errors, all validly cast ballots should be counted. But instead of ensuring that the

final election results are accurate, the court's decision will result in some improperly rejected ballots not being counted because the parties cannot agree.

Finally, to the extent that the court relies on *Andersen* for the proposition that the phrase "obvious error in counting," as set forth in sections 204C.38 and .39, is limited to errors in the computation and reporting of numbers, it is not at all clear that the errors before the *Andersen* court were only errors of that type. It is clear, however, that the *Andersen* court did not limit the type of errors it permitted to be corrected to, as this court suggests, the "compilation and reporting of numbers contained in the precinct summary statements." The *Andersen* court explained that Minn.Stat. § 204.30 (1961), "[f]or the first time," provided that "county canvassing board[s] could, if necessary, inspect the ballots in order to correct obvious errors." *Id.* at 263, 119 N.W.2d at 6. And county canvassing boards did just that. In Blue Earth, Douglas, Le Sueur, Morrison, Watonwan, and Stevens counties, the *Andersen* court expressly stated that the counting errors were confirmed upon *examination of the ballots. Id.* at 259–61, 119 N.W.2d at 3–6 (emphasis added). Obviously, examination of ballots involves more than computation and reporting of numbers. In Grant County, the court allowed the inclusion of 31 absentee ballots that had not been counted in the original returns. *Id.* at 260, 119 N.W.2d at 4. Thus, while the court chooses selective phrases from *Andersen* to justify its decision, a complete reading of *Andersen* supports the conclusion that the correction of obvious errors as alleged here is permitted under Minn.Stat. §§ 204C.38 and .39.

In the end, the *Andersen* court permitted all identified errors to be corrected and rejected the attempt of one of the parties to distinguish between the types of errors to be corrected. 264 Minn. at 270, 119 N.W.2d at 10.

2. Election statutes should be interpreted to avoid absurd results.

Applying our rules of statutory construction, we construe statutes to avoid absurd results. *State v. Clark,* 755 N.W.2d 241, 249 (Minn.2008); Minn.Stat. § 645.17 (2008). Minnesota Statutes § 204.30 (1961), the precursor to Minn. Stat. § 204C.39 (2008), was passed by the legislature to avoid the necessity of election contests when possible. *Andersen,* 264 Minn. at 262, 119 N.W.2d at 5. At the time of the election that generated the *Andersen* litigation, section 204.30 provided that county canvassing boards could, on the agreement of four out of five county canvassing board members, unilaterally correct any obvious errors. *Id.* After *Andersen,* the statute was amended to implement procedures similar to those found in Minn.Stat. §§ 204C.38 and .39 today. Act of Mar. 15, 1965, 1965 Minn. Laws 116, 117–18 (codified as Minn.Stat. § 204.30 (1967)). There is nothing to suggest that the amendment was intended to alter the legislative purpose of avoiding election contests when possible. Limiting "obvious error in counting" to errors in the computation and recording of numbers contravenes the statute's purpose by making election contests all but guaranteed in close elections. Moreover, it is unreasonable to think that the legislature would have put in place the elaborate procedures set out in sections 204C.38 and .39 solely for the correction of errors involving the computation and recording of numbers. Requiring a court order to correct such errors would result in a significant waste of judicial resources.

The court counters that the legislature could have implemented the process as a safeguard to ensure that the most vocal

candidate could not exert undue political pressure on local county canvassing boards to amend their returns. I do not disagree that the legislature may have adopted the procedures set out in sections 204C .38 and .39 to prevent undue political pressure on local canvassing boards. In fact, I suspect, at least in part, that was the legislature's purpose. In *Andersen*, while both candidates, Andersen and Rolvaag, initially agreed to re-open a county canvassing board even though it had already completed its returns, Rolvaag subsequently took the position that such re-opening was illegal. Stinnett & Backstrom, *Recount, supra*, at 71. Andersen then moved to re-open as many counties favorable to him as he could. *Id.* After Andersen pulled ahead in the vote count, Rolvaag decided that he would have to try to recanvass precincts with "obvious error[s]" that favored him. *Id.* at 73. But when Rolvaag was not successful in getting any canvassing boards to reopen, his political party accused Andersen of "applying pressure on county boards to disregard election laws and procedures to search for [Andersen] votes while at the same time attempting to prevent canvass recounts which appear to favor [Rolvaag]." *Id.* at 74.

Thus, while I agree that the rationale for the legislative changes was partly intended to limit undue influence on county canvassing boards, that fact has no bearing on this case. Before *Andersen*, the statute permitted county canvassing boards to unilaterally correct any obvious error when four of five canvassing board members so chose. After *Andersen*, the legislature amended the procedures to be followed when correcting obvious errors. But while the legislature changed the procedures to be followed, the legislature did not change or otherwise limit the scope of counting and reporting errors that could be corrected. Absent an express change in scope, our rules of construction lead inescapably to the conclusion that, as was the case before the amendments, the scope of correctable obvious errors goes beyond computation and recording of numbers and includes any and all obvious errors in counting and recording.[1]

3. The court implicitly concedes that counting includes the process of determining which absentee ballots are to be included in the county canvassing boards' reports.

The opinion reads, "[w]e begin by briefly reviewing the statutory provisions for *processing of ballots.*" (Emphasis added.) The court's not-so-subtle effort to avoid using the word "counting" to describe which absentee ballots are to be included in the count for purposes of reporting the number of votes cast for the office, fails. A rose, by any other name, is still a rose. The process of determining which votes to include in the count of votes to be reported, by any other name, is the process of counting. As such, obvious errors in that process come within the scope of "obvious error in counting and reporting" as used in Minn.Stat. §§ 204C.38 and .39.

In detailing the counting process, the court notes that a recount's purpose is "to ensure that the votes cast in [an] election [are] accurately counted." The court then defines the scope of reviewable errors that may be corrected in a "recount" as errors

---

1. As an aside, because there is nothing political about a number that is transposed or subtracted instead of added, I again question why there would be a need for the legislature to create such elaborate procedures for the correction of mere computation and reporting errors. That need is understandable, however, if, contrary to the court's suggestion, the scope of the errors that can be corrected includes more than computation and recording errors.

in "the determination of the number of votes validly cast for the office." Curiously, while the court implicitly recognizes that the improper rejection of an absentee ballot constitutes an error in determining the number of votes validly cast for an office, the court nonetheless concludes that such errors do not fall within the scope of "counting" and are only subject to review in an election contest. That conclusion is premised on the erroneous view that the words "obvious error in counting" only include errors in the computation and reporting of numbers.

4. Minnesota Statutes § 204C.39 does not prescribe a deadline for counties to correct obvious errors in counting.

The court concludes that counties cannot correct obvious errors under Minn.Stat. § 204C.39 after the State Canvassing Board has canvassed the original results and an administrative recount is under way. In *Andersen*, we noted that if the legislature can provide that a court can order a canvassing board to reconvene to correct an error, it may also provide that the board can reconvene on its own once errors are discovered. *Id.* at 267, 119 N.W.2d at 8. But we did not decide whether the legislature had authorized this; we concluded that, even if canvassing boards did not have the authority to unilaterally reconvene as they had done, a court exercising its error-correcting authority could have ordered them to do so. *Id.*

The court here correctly notes that in *Andersen* we stated that under any construction of the existing statute, there should be a cutoff point at the time the state canvassing board met. *Id.* at 263, 119 N.W.2d at 5–6. Based on this, the court concludes that counties may not correct errors under Minn.Stat. § 204C.39 after the State Canvassing Board has begun an administrative recount. But, unlike the statute in effect at the time of *Andersen*, which provided that errors discovered while county canvassing boards were canvassing votes could be corrected, Minn. Stat. § 204C.39 today does not contain any language limiting when errors may be corrected. Thus, the statement in *Andersen* that county boards cannot correct errors after the state canvassing board has met has no effect today. Further, even if it did, the proper remedy here would be to exercise our error-correcting authority and permit the counties to amend their reports to reflect the true outcome of the election using the procedures set out in Minn.Stat. 204C.39. It is not to adopt a judicially-created process guaranteed to result in voter disenfranchisement.

The three points made by Justice Anderson in his dissent that I want to emphasize are:

1. The question presented by this case.

The question presented by the parties is whether *obvious errors* by *local election officials* in rejecting validly cast absentee ballots in the initial counting of the votes cast for United States Senator in the November 4, 2008, general election can be corrected using the procedures set out in Minn.Stat. §§ 204C.38 and .39.

2. Election statutes are to be liberally construed.

We are to liberally construe Minnesota's election laws, guided by the principle that "[s]tatutory regulations of the election franchise must be so construed as to insure, rather than defeat, full exercise thereof when and wherever possible." *Flakne v. Erickson*, 213 Minn. 146, 151, 6 N.W.2d 40, 42 (1942).

Here, instead of liberally construing the term "obvious error in counting" to ensure the full protection of the voting franchise, the court, applying a narrow construction,

concludes that the erroneous rejection of validly cast absentee ballots cannot be corrected under either section 204C.38 or .39. Such a narrow interpretation is inconsistent with our past election law cases. For example, in *Scow v. Gutches*, we considered whether an election contest could be brought after a tie vote because the statute only provided for a contest after one candidate was "declared elected." 129 Minn. 301, 303, 152 N.W. 639, 639 (1915). Although noting that a "strict and technical construction" of the statute would prohibit an election contest as there was no declared winner, we concluded that the statute should be liberally interpreted to permit an election contest in order to ascertain the true result of the election. *Id.* at 303–04, 152 N.W. at 640. Similarly, in *Grimsrud v. Johnson*, a case involving the use of improper ballots in a school board election, we concluded that the improperly used ballots should be counted even though a literal reading of the statute would have indicated otherwise. 162 Minn. 98, 99–100, 202 N.W. 72, 73 (1925). We concluded that voters should not be disenfranchised "[b]ecause some officer having to do with the election has not fully carried out what the statutes direct him to do ... if it can be avoided by any reasonable interpretation." *Id.* at 100, 202 N.W. at 72.

Finally, in *Andersen*, we considered whether to permit correction of "obvious error in counting and recording," even though the statutorily prescribed timeline had not been followed. 264 Minn. at 261–62, 119 N.W.2d at 5. While a literal reading of the statute would have barred corrections, as the statute provided for correction while canvassing the votes, we construed the statute at issue to effectuate its purpose. *Id.* at 262–63, 119 N.W.2d at 5–6. In doing so, we noted that, while it would have been better for the errors to have been corrected during the initial canvass as provided by statute, the overall object of declaring the candidate with the most legal votes the winner should take priority over a prescribed method that could result in declaring the loser the winner. *Id.* at 271, 119 N.W.2d at 10–11.

Here, by its narrow construction of the phrase "obvious error in counting," the court's decision works to defeat, not ensure, the full exercise of the voting franchise.

3. The right to vote is fundamental.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). That right, the right to vote, is a fundamental and personal right. *State ex rel. South St. Paul v. Hetherington*, 240 Minn. 298, 303, 61 N.W.2d 737, 741 (1953). By this decision, that most precious right is diminished.